**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| INA G. CUMMINGS, | CASE NO. 3:24-CV-01368 |
| Plaintiff, | |
| | JUDGE JEFFREY J. HELMICK |
| vs. | |
| | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Ina G. Cummings ("Plaintiff" or "Ms. Cummings") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.      Procedural History

Ms. Cummings filed her SSI application on May 11, 2021, alleging disability beginning August 30, 2013.[1]  (Tr. 18, 80, 213.)  She alleged disability due to physical and mental

---

[1] Ms. Cummings had prior applications in 2007, 2013, and 2017.  (Tr. 18.)  Her request to reopen the prior applications was denied.  (*Id.* at pp. 18-19.)  To be eligible for SSI, a claimant must show that she was disabled while her application was pending, and the earliest month for payment of SSI benefits is the month after the application for benefits was filed.  *See* 20 C.F.R. §§ 416.330, 416.335.

impairments.  (Tr. 81, 91, 105, 124, 217.)  Her application was denied at the initial level (Tr. 101-05) and upon reconsideration (Tr. 122-27).  She then requested a hearing.  (Tr. 128-30.)

On June 7, 2023, a telephonic hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 37-65.)  The ALJ issued an unfavorable decision on August 3, 2023, finding Ms. Cummings had not been under a disability since May 11, 2021, the date the application was filed.  (Tr. 15-36.)  Plaintiff requested review of the decision by the Appeals Council.  (Tr. 191-93.)  The Appeals Council denied her request for review on June 12, 2024, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-7.)  Plaintiff filed the pending appeal on August 9, 2024 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 7 & 9).

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Cummings was born in 1978.  (Tr. 30, 213.)  She was 42 years old on the date the application was filed.  (Tr. 30.)  She has a high school education (Tr. 30, 44, 218) and last worked in 2000 (Tr. 43-44, 217).

### B.    Medical Evidence

Although the ALJ identified several severe physical and mental impairments (Tr. 21), Ms. Cummings bases her appeal solely on medical opinions regarding her mental impairments (ECF Doc. 7).  The evidence summarized herein is accordingly limited to that which relates to Ms. Cummings's mental health symptoms and treatment.

#### 1.    Relevant Treatment History

During a December 31, 2019 office visit with Ashley Degutis, APRN, CNP at Center Street Community Health Center ("Center Street") for pain, Ms. Cummings also complained of anxiety and depression.  (Tr. 878-85.)  She presented with anxious and fearful thoughts and

fatigue but denied suicidal thoughts. (Tr. 878.) She associated her anxiety and depression with her chronic pain and headaches. (*Id*.) She reported that a relieving factor was medication. (*Id*.) On examination, Ms. Cummings was anxious, but she was oriented to time, place, person, and situation, her mood and affect were appropriate, and there was no suicidal ideation. (Tr. 883.)

On May 13, 2020, Ms. Cummings had a telephone follow up visit at Center Street regarding her anxiety and depression and other health conditions. (Tr. 886.) She presented with anxious and fearful thoughts and depressed mood. (*Id*.) She denied suicidal thoughts but reported a worsening of her anxiety and depression symptoms. (*Id*.) She said she needed medication refills because they were not sent following her prior visit. (*Id*.)

When Ms. Cummings returned to Center Street a year later, on May 7, 2021, she reported improvement in her initial anxiety and depression symptoms. (Tr. 893, 1219, 1249.) Her mental status examination findings were normal. (Tr. 1222, 1252.) During an August 3, 2021, office visit at Center Street (Tr. 1242-48), Ms. Cummings was anxious on examination, but her mental status findings were otherwise normal (Tr. 1245).

On October 20, 2021, Ms. Cummings was taken to Marion General Hospital's emergency room by the police for a mental health evaluation after cutting her arm. (Tr. 1027-28, 1037.) Her reported symptoms included anxiety, appetite disturbance, depression, interpersonal conflict, and sleep disturbance. (Tr. 1037.) She was agitated at times about being in the emergency room and tearful when talking about her husband. (*Id*.) But she was open, responsive to questions, very cooperative, and her speech and eye contact were appropriate. (*Id*.) According to Ms. Cummings, her husband had called the police. (*Id*.) She said she and her husband were in a fight the prior weekend and he had not been staying at their home since their fight. (*Id*.) She said she was stressed after talking with him that evening, but denied she was attempting to end

3

her life and denied ever having suicidal ideation.  (*Id.*)  She reported a history of anxiety and depression for which she was taking medication prescribed by her primary care physician.  (*Id.*)  She said that she was compliant with her medication, and it was effective.  (*Id.*)  She reported having support from her parents, ex-husband, sister, friends in her apartment complex, church friends, and the Lord.  (*Id.*)  She had not been able to work due to her medical conditions, but reported that she enjoyed crafting at home and attended church regularly.  (*Id.*)  Ms. Cummings's mother was also interviewed.  (Tr. 1037-38.)  She said she did not believe her daughter would ever hurt herself, noting they were brought up in the church and Ms. Cummings was still involved with the church.  (Tr. 1038.)  She said that her daughter was stressed about her medical problems and not feeling good in her body due to her diagnoses, and that the conflict with her husband had made things worse.  (*Id.*)  She felt her daughter was safe to return home.  (*Id.*)  On examination, Ms. Cummings appeared sad, demonstrated partial awareness and fair judgment, was preoccupied by external stressors, and acted without considering alternatives.  (*Id.*)  But she was alert and cooperative, her speech was appropriate, her memory was within normal limits, and she was oriented to person, place, and time.  (*Id.*)  Her strengths were noted to include basic self-care skills, family and friends, housing, interpersonal skills, leisure skills, motivation to change, and spiritual beliefs.  (*Id.*)  She was future oriented and indicated an intent to seek out her pastor for support.  (Tr. 1039.)  She was discharged home with her mother.  (*Id.*)

During a follow-up visit at Center Street on December 14, 2021 (Tr. 1234-40), Ms. Cummings denied anxiety (Tr. 1234, 1236).  On mental status examination, she was oriented to time, place, manner, and situation, and her mood and affect were appropriate.  (Tr. 1237.)

On April 25, 2022, Ms. Cummings returned to Center Street for medication refills.  (Tr. 1227.)  On mental status examination, she was oriented to time, place, manner, and situation, and her mood and affect were appropriate.  (Tr. 1230.)

On May 5, 2023, Ms. Cummings presented to Joshua Shuh, D.O., at Center Street for medication refills.  (Tr. 1259.)  Her mental status findings were normal.  (Tr. 1262.)  Her diagnoses included adjustment disorder with mixed anxiety and chronic depressed mood.  (*Id.*)  Dr. Shuh refilled her prescription for Topamax, noting it had been effective in the past, and restarted venlafaxine.  (*Id.*)

### 2.    Opinion Evidence

#### i.    Consultative Examiner

On December 20, 2021, consultative examiner Don McIntire, Ph.D., conducted a psychological evaluation.  (Tr. 938-48.)  Ms. Cummings said she was applying for disability benefits because "[she] [hasn't] been able to work for many years because of multiple problems.  [she] can't sit, lie down, or have anything touch [her] back because it hurts.  [She] can't wear certain clothes because it hurts.  [She] [has] pressure headaches all of the time."  (Tr. 939.)

When discussing her work history, Ms. Cummings reported difficulties getting along with her boss and admitted she was "strong-headed."  (Tr. 940.)  She said she was "anxious when working around others but she did not experience panic at work."  (*Id.*)  She said she had never been fired or promoted at work.  (*Id.*)  If a supervisor stopped to observe her while she was working, she said she would be nervous and would make mistakes.  (*Id.*)  She also said that she "would probably cry" if a supervisor criticized her work.  (*Id.*)

Ms. Cummings reported getting along well with her family and visiting with her parents and in-laws.  (Tr. 941.)  She reported belonging to a church and getting along well with her

neighbors, but said she did not socialize with friends.  (*Id*.)  She said she was anxious around other people, and would be anxious if she was in a waiting room with other people because she would think they were judging her and would talk about her due to her humped back or possibly being in a wheelchair.  (*Id*.)  She reported being more social when she was younger.  (*Id*.)  She said she would not be able to go into a business to ask for an application but would be able to complete a job interview.  (*Id*.)  She could go to the store on her own to buy one or two items but could not eat alone in a restaurant or use public transportation alone.  (*Id*.)  She also said she could not walk alone in her neighborhood due to anxiety, and that she was careful when answering her door or telephone.  (*Id*.)

Ms. Cummings said she did not attend counseling, either as a child or adult, but was taking venlafaxine.  (Tr. 941-42.)  She denied hallucinations or past psychiatric hospitalizations.  (Tr. 942.)  She reported threatening to kill herself earlier that year due to problems with her husband but denied current suicidal thoughts.  (*Id*.)

Ms. Cummings reported consistent depression since she was a child.  (*Id*.)  She also reported frequent crying spells, irritability, and an "explosive temper."  (*Id*.)  She said she felt apathetic often, especially because her pain prevented her from moving and caused her to remain in bed throughout the day.  (*Id*.)  She also refrained from bathing or dressing for several days in part because it exhausted her.  (*Id*.)  She said she worried obsessively about things and had problems with her memory and concentration.  (*Id*.)

On examination, Plaintiff spoke clearly and had no difficulty comprehending, expressing herself, or answering questions without unnecessary digression.  (Tr. 943.)  Her speech was understandable, she was able to initiate conversation, and she exhibited a full range of inflections.  (*Id*.)  She presented as depressed and was tearful during part of the evaluation, but

6

she was also pleasant and cooperative, her affect was congruent with the topic of conversation, and she did not show signs of agitation, irritability, or anger.  (*Id.*)  She was calm and showed no signs of panic or fear of her surroundings.  (*Id.*)  She made eye contact during the evaluation, and showed no overt signs of anxiety, such as trembling, shaking, or stammering.[2]  (*Id.*)

Dr. McIntire diagnosed: major depressive disorder, single episode, severe without psychotic features; social anxiety disorder; and generalized anxiety disorder.  (Tr. 945-46.)  He opined that Ms. Cummings's "ability to understand, remember and follow basic instructions is good . . . [s]he is consistently able to understand and follow abstract instructions" and "read instructions but she is unable to follow multi-step instructions without the need for reminders . . ."  (Tr. 946.)  Second, he opined that her "ability to maintain attention and concentration on simple, repetitive tasks is mixed . . . [and] [h]er performance on more complicated tasks that required the mental manipulation of information was limited[.]"  (*Id.*)  Third, he opined that her "ability to get along with coworkers is limited by her anxiety and withdrawal as this interferes with her ability to establish and maintain an effective working relationship with others," noting she was "pleasant and cooperative with the examiner, but also appeared to be self-conscious."  (*Id.*)  Finally, he opined that her "ability to manage everyday work stress is limited by her anxiety and depression as she has little energy to engage in problem-solving and she often feels apathetic" and "[s]he copes with the anxiety of being around others by avoiding people."  (*Id.*)

### ii.    State Agency Psychological Consultants

On January 3, 2022, state agency psychological consultant Paul Tangeman, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 84) and Mental RFC Assessment (Tr.

---

[2] During the physical consultative examination conducted by Justin Hunter, D.O. on April 23, 2022, Ms. Cummings's mood was described on examination as anxious and she was mildly tearful (Tr. 951, 952), but she was also alert with good eye contact and fluent speech, her thought processes were clear, her memory was normal, her concentration was good, and she was oriented to time, place, person, and situation (Tr. 951).

87-88). In the PRT, Dr. Tangeman opined that Ms. Cummings had moderate limitations in her ability to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. (Tr. 84.) In the Mental RFC Assessment, Dr. Tangeman opined that Ms. Cummings could: complete one-to-three step tasks; complete simple, routine tasks in a static work setting; complete work tasks in a setting where interaction with others is superficial; and work in an environment where changes in work duties are infrequent and easily explained. (Tr. 87-88.)

On March 18, 2022, state agency psychological consultant Karla Delcour, Ph.D., agreed with Dr. Tangeman's opinions as set forth in the PRT and Mental RFC Assessment on reconsideration. (Tr. 93-94, 97-99.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

Ms. Cummings testified in response to questioning by the ALJ and her counsel at the hearing on June 7, 2023. (Tr. 43-58.) She said she stopped working about twenty-three years earlier due to pain in her back, which she said was her most limiting condition. (Tr. 43-44.) In addition to providing testimony regarding her physical impairments (Tr. 44-50), Ms. Cummings testified regarding her depression and anxiety (Tr. 50-52, 56-57). She reported difficulties with her memory, both short-term and long-term. (*Id.*) She said she could understand simple instructions and did not have difficulty following a television show. (Tr. 51.) But she said she zoned out at times when someone was talking to her. (*Id.*)

Ms. Cummings said she did not engage in activities outside the home, not even going to church. (Tr. 51-52.) She used to go to church but had not been in "forever." (Tr. 52.) She said her life consisted primarily of being in her room, as she was in constant pain, which was "so

8

depressing."  (*Id*.)  She could not have a "normal life," and it was "so frustrating to feel like [she] [was] stuck in a body that just doesn't want to move or go anywhere, work or -- you know, and walk around with a big hump on my back and suff.  And it's just how people look at you."  (*Id*.)

Ms. Cummings reported frequent crying spells, but she said she tried to keep it to herself because her kids had enough to handle with her not being able to go or do anything with them. (Tr. 56.)  She said she got nervous being around other people.  (*Id*.)  She did not feel comfortable around others because she usually could not sit in straight chairs that normal people were able to sit in because of her curved back.  (Tr. 46, 56-57.)  She also said she could not stand and talk to people because she was unable to stand for very long and she felt that everyone stared at her because of how curved her back was.  (Tr. 57.)  It was hard to be around other people because they asked her about her back condition and she did not want to "sit there and explain it to everybody."  (*Id*.)  She said it was "just a lot to handle to be around a bunch of other people that just don't understand what's going on with your body and stuff."  (*Id*.)  She felt that "all eyes [were] on [her]" and it made her sweaty, nervous, and shaky.  (*Id*.)  As a result, she did not like being in a large group of people, around unfamiliar people, or in a large store if she could avoid it.  (*Id*.)  She said she preferred to just stay at home and see the people that she had to see.  (*Id*.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  (Tr. 59-64.)  In response to the ALJ's first hypothetical, which mirrored the RFC assessed by the ALJ (Tr. 25), the VE testified that a hypothetical individual of Ms. Cummings's age and education, with no past work experience, could perform sedentary positions in the national economy such as: housekeeping cleaner, merchandise marker, inspector and hand packager, and routing clerk.  (Tr. 59-60.)    The VE testified that needing two or more additional breaks beyond those generally permitted or

9

having two or more absences in a month would be work preclusive. (Tr. 61-62.) The VE further testified that, if the individuals described in the ALJ's first three hypotheticals "would be unable to handle anything more than shallow or cursory types of interaction with others, including their supervisors," it would "cause some problems in terms of [the] individual being able to complete the interview process, training period, and being able to handle employee reviews." (Tr. 62-63.) The VE also testified that having to work in a solitary or isolated work setting would be inconsistent with competitive employment. (Tr. 63.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed

10

impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters*

*v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden then shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

## IV.      The ALJ's Decision

In her August 3, 2023, decision, the ALJ made the following findings:[3]

1.      The claimant has not engaged in substantial gainful activity since May 11, 2021, the application date.  (Tr. 21.)

2.      The claimant has the following severe impairments: ankylosing spondylitis multiple sites of the spine and joints; fibromyalgia; obesity status-post remote gastric bypass; anxiety disorder and depressive disorders.[4]  (*Id.*)

3.      The claimant does not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 22-25.)

4.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps or stairs; occasional stooping,

---

[3] The ALJ's findings are summarized.

[4] The claimant has other physical impairments that were found to be non-severe.  (Tr. 21-22.)

kneeling, crouching, and crawling; frequent balancing; limited to understanding, remembering, and carrying out simple instructions; can deal with only occasional changes in a routine work setting; limited to occasional interaction with the public, coworkers, and supervisors; cannot perform work requiring a specific production rate such as assembly line work or work that requires hourly quotas. (Tr. 25-29.)

5.    The claimant has no past relevant work. (Tr. 29.)

6.    The claimant was born in 1978, and was 42 years old, defined as a younger individual age 18-49, on the date the application was filed. (Tr. 30.)

7.    The claimant has at least a high school education. (*Id.*)

8.    Transferability of job skills is not material to the determination of disability. (*Id.*)

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including housekeeping, merchandise marker, routing clerk, and inspector and hand packager. (Tr. 30-31.)

Based on the foregoing, the ALJ found Ms. Cummings has not been under a disability, as defined in the Social Security Act, since May 11, 2021, the date the application was filed. (Tr. 31.)

## V.    Plaintiff's Argument

Ms. Cummings presents one assignment of error. (ECF Doc. 7, pp. 2, 6-11.) She argues "[t]he ALJ's decision to reject the state agency psychologists' opinion limiting Ms. Cummings to superficial interaction with others was not supported by substantial evidence and ultimately led to an inaccurate residual functional capacity." (*Id.* at p. 6.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives

13

the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## B. The ALJ Adequately Evaluated the Medical Opinions of the State Agency Psychological Consultants and Adopted an RFC Supported by Substantial Evidence

In her sole assignment of error, Ms. Cummings argues that the ALJ's failure to adequately evaluate the state agency psychological consultants' opinions resulted in an "inaccurate" RFC. (ECF Doc. 7, pp. 2, 6-11.)

### 1. Evaluating Medical Opinion Evidence and Assessing RFC Limitations

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation. 20 C.F.R. § 416.920c(a). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors. 20 C.F.R. § 416.920c(c)(1)-(5). The most important factors are supportability and consistency. 20 C.F.R. §§ 416.920c(a), 416.920c(b)(2). ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors. 20 C.F.R. § 416.920c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1). In

14

other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record.

 An ALJ is charged with assessing a claimant's RFC "based on all the relevant evidence in [the] case record."  20 C.F.R. § 416.945(a)(1); *see also* 20 C.F.R. § 416.9546(c) "(If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.");  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician.").  Although an ALJ must determine the RFC based on the relevant evidence in the record, including medical opinion evidence, an ALJ is "not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding."  *Poe*, 342 F. App'x at 157; *see* 20 C.F.R. §§ 416.945(a)(1), 416.946(c).

Even where an opinion has been given great weight, the Sixth Circuit held that "there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).  Indeed, the Sixth Circuit has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."  *See Mokbel-*

*Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) (citing *Shepard v. Comm'r of Soc. Sec.,* 705 F. App'x 435, 442-43 (6th Cir. 2017). Indeed, the Sixth Circuit observed that requiring ALJs to base RFCs on medical opinions could give medical providers "the authority to make the determination or decision about whether an individual is under a disability," which "would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (internal quotation and citation omitted); *see also Poe*, 342 F. App'x at 157 (finding "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding").

Nevertheless, Social Security Ruling (SSR) 96-8p requires ALJs to consider all medical opinions in assessing the RFC, and where the assessment "conflicts with an opinion from a medical source," the ALJ "must explain why the opinion was not adopted." SSR 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34478 (July 2, 1996); *see Fleischer*, 774 F. Supp. 2d at 881 (citing SSR 96-8p).

### 2. ALJ Adequately Evaluated State Agency Psychological Consultants' Opinions and Assessed Plaintiff's RFC Based on Relevant Evidence

The ALJ evaluated the opinions of state agency psychological consultants Drs. Tangeman and Delcour, explaining:

> The undersigned finds the state-agency psychological consultants' mental assessments persuasive to the extent these support reduced complexity, novelty, and interactions generally. This is consistent with and supported by the evidence as a whole and has been incorporated into the residual functional capacity. However, the unde[r]signed does not adopt the specific limitations because some limitations are not vocationally relevant without additional explanation, e.g., superficial, 1-3 step tasks, infrequent. The undersigned also notes as to superficial that the evidence supports reduced contact with others, but it does not support specific limitation in the nature of the limitations. Although Dr. McIntire noted social anxiety and the claimant reports anxiety around people, she nevertheless interacted appropriately with a wide variety of sources throughout the record. She is consistently

<u>cooperative and appropriate notwithstanding anxiety. Thus, the evidence does not</u> <u>warrant additional limitation in terms of quality/nature of interactions.</u> The undersigned has also found greater limitations in terms of concentration, persistence, and pace with an additional restriction related to productivity and pace of the work. This also reduces stress in the workplace. The undersigned has translated infrequent to occasional, which as a specific definition in the DOT and fully accounts for the claimant's stress tolerance. The undersigned also translates 1-3 step tasks to simple instructions with the additional restrictions in terms of productivity, pace, and novelty. This fully accounts for any limitation in the claimant's ability to understand, remember, and carry out tasks as well as maintain concentration, persistence, and pace [].

(Tr. 29 (emphasis added) (citation omitted).)

Ms. Cummings argues that this analysis is deficient for several reasons. (ECF Doc. 7, pp. 7-11.) First, she challenges the ALJ's observation that "some limitations are not vocationally relevant without additional explanation, e.g., superficial" (Tr. 29), arguing the lack of a DOT definition for a term does not mean the ALJ can ignore medical opinions using the term. (ECF Doc. 7, p. 7.) Second, she argues that the ALJ's adoption of a limitation to "occasional" interactions did not account for the limitation to "superficial" interactions because "[t]he two terms are distinct from one another." (*Id.* at p. 8.) Third, she argues that the ALJ did not adequately explain why a limitation to superficial interactions was not supported by or consistent with the record, since she (1) did not cite to the record in support of her conclusions and (2) misrepresented the records. (*Id.* at pp. 8-10.) Finally, she argues that the ALJ's rejection of the limitation to "superficial" interactions was not supported by substantial evidence. (*Id.* at pp. 10-11.) The undersigned will address each argument in turn.

As to the first argument—that the ALJ cannot "ignore" opinions limiting her to superficial interactions just because the term is not defined in the DOT—the Commissioner responds that "the ALJ did not 'ignore' the suggested limitation at all," but instead "explained that she found the limitation to superficial interaction was not consistent with daily activities and

clinical reporting regarding Plaintiff's ability to maintain social interaction with others."  (ECF Doc. 9, p. 7.)  The undersigned agrees.  Although the ALJ accurately observed that the term "superficial" is not "vocationally relevant without additional explanation,"[5] she went on to conclude that "the evidence supports *reduced contact* with others, but it does not support specific limitation in the *nature* of the limitations."  (Tr. 29 (emphasis added).)  She explained further:

> Although Dr. McIntire noted social anxiety and the claimant reports anxiety around people, she nevertheless interacted appropriately with a wide variety of sources throughout the record. She is consistently cooperative and appropriate notwithstanding anxiety. Thus, the evidence does not warrant additional limitation in terms of quality/nature of interactions.

(*Id.*)  Rather than ignoring the limitation to "superficial" interactions, the ALJ explained why she found a limitation in the *quality/nature* of interactions was not supported by the evidence while a limitation in the *amount* of contact with others was supported.  This determination was explicitly based on the evidence and within the ALJ's "responsibility for determining a claimant's residual functional capacity."  *See Poe*, 342 F. App'x at 157.  Plaintiff's first argument lacks merit.

As to the second argument—that the adoption of an RFC limiting Ms. Cummings to "occasional" interactions does not account for the limitations to "superficial" interactions because "[t]he two terms are distinct from one another"—the analysis above makes it clear that the ALJ recognized the distinctions between the terms, but found the evidence did not support limitations in the *nature* of communications (as implicated by the term "superficial") but did

---

[5] "SSA guidance states that VE testimony 'generally should be consistent with the occupational information supplied by the DOT'" and "the Commissioner's internal manual instructs ALJs 'not [to] permit the VE to respond to questions on medical matters or to draw conclusions not within the VE's area of expertise.'"  *Lopez v. Comm'r of Soc. Sec.*, No. 1:22-CV-01801, 2024 WL 1580101, at *20 (N.D. Ohio Apr. 11, 2024) (quoting SSR 00-4p and HALLEX 1-2-6-74(C)).  Accordingly, "a VE's testimony must be based on her own vocational expertise and/or the information in the [DOT and SCO] and cannot be based on conclusions outside of her expertise, assumptions that are not clearly described on the record, or assumptions or definitions that are inconsistent with the SSA's policies or definitions."  *Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-CV-02370, 2022 WL 721455, at *16 (N.D. Ohio Jan. 13, 2022) (citing SSR-004p) (emphasis in original), *report and recommendation adopted* 2022 WL 716105 (N.D. Ohio Mar. 10, 2022).

support limitations in the *amount* of communications (as implicated by the term "occasional"). The ALJ did not treat the terms as interchangeable and the second argument lacks merit.

As to Plaintiff's third argument—that the ALJ's explanation was inadequate under the regulations because she did not cite to specific records in support of her conclusions—the Commissioner argues that "[t]his argument is flawed because it seeks to avoid reading the ALJ's decision as a whole."  (ECF Doc. 9, pp. 8-9.)  The undersigned agrees.

In order to articulate a decision supported by substantial evidence, an ALJ is not "required to discuss each piece of data in [her] opinion, so long as [she] consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion."  *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curium)).  An ALJ is also permitted to rely on previously articulated information to support her opinion analysis.  *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding no need to require the ALJ to "spell out every fact a second time").

Ms. Cummings first highlights the ALJ's finding that "[a]lthough Dr. McIntire noted social anxiety and [Ms. Cummings] reports anxiety around people, she nevertheless interacted appropriately with a wide variety of sources throughout the record" (Tr. 29), arguing that the ALJ did not specifically "identify the 'variety of sources' that Ms. Cummings interacted with." (ECF Doc. 7, pp. 9-10.)  On the contrary, a review of the ALJ's earlier discussion of the medical

treatment records reveals that she identified objective medical findings from multiple medical sources that were consistent with a finding that Plaintiff "interacted appropriately," including:

- A May 2020 primary care visit where she "appeared anxious, but otherwise appropriate" (Tr. 27);

- A mental health evaluation during a hospital visit in October 2021 where she "was tearful at times, but otherwise appropriate," and "appeared agitated but also open and responsive and 'very cooperative'" (*id.*);

- A consultative examination in December 2021 where she "appeared depressed, but also no signs of agitation[,] irritability, or panic," "maintained eye contact with no overt signs of anxiety," and "was pleasant and cooperative, though self-conscious" (Tr. 27-28); and

- Primary care records through May 2023 in which her "mental status exams [we]re routinely appropriate" and she was "cooperative, alert, oriented, with normal insight and judgment and appropriate mood and affect" (Tr. 28).

Ms. Cummings also challenges the ALJ's finding that she was "consistently cooperative and appropriate notwithstanding anxiety" (Tr. 29), asserting that "[t]he ALJ did not identify what parts of the record demonstrated her being cooperative and appropriate."  (ECF Doc. 7, p. 10.)  On the contrary, as outlined above, the ALJ had already identified numerous records showing that Ms. Cummings presented as cooperative and appropriate in her mental status examinations (Tr. 27-28), and was not required to repeat those earlier discussions in her opinion analysis (Tr. 29).  *See Crum*, 660 F. App'x at 457; *Bledsoe*, 165 F. App'x at 411.  Accordingly, Plaintiff's argument that the ALJ failed to cite to the records supporting her analysis must also fail.

Ms. Cummings also argues that "the ALJ's allegations of Ms. Cummings being cooperative and appropriate were a misrepresentation of the record" because the ALJ did not explain why a person's ability to "get along with, or at the very least, not fight with their medical providers" would support a limitation to "occasional" interactions but not a limitation to "superficial" interactions.  (ECF Doc. 7, p. 10.)  In support, she highlights her own subjective complaints to consultative examiner Dr. McIntire and notes that he opined she would have a

20

limited ability to get along with others due to her anxiety and social withdrawal. (*Id.*) The Commissioner responds that "Dr. McIntire did not suggest Plaintiff needed a limitation to superficial interaction" and argues that "[a]t best, Plaintiff's argument highlights the fact that [the] ALJ rendered a decision despite potentially ambiguous evidence," which "is exactly the ALJ's role." (ECF Doc. 9, p. 10.) The Commissioner further asserts that this argument "impermissibly invites the Court to substitute its judgment for the ALJ's." (*Id.*)

To the extent Ms. Cummings is arguing that the ALJ erred because her analysis was "internally inconsistent" and "does not allow for a subsequent reviewer to trace the ALJ's reasoning" (ECF Doc. 7, p. 10), the argument is not well taken. The ALJ explained that she found the medical records showing complaints of social anxiety and clinical findings consistent with anxiety supported a limitation to "reduced contact with others," but that "additional limitation[s] in terms of [the] quality/nature of interactions" were not warranted in light of other clinical examination findings showing Plaintiff was able to maintain consistently "appropriate" and "cooperative" behavior around a variety of medical providers. (Tr. 29.) Thus, the ALJ adequately explained her findings, which fell within the "zone of choice" in which the ALJ was permitted to "go either way, without interference by the courts." *Blakley*, 581 F.3d at 406 (quotation marks and citation omitted). Despite her assertion that the ALJ misrepresented the records, Ms. Cummings has not identified any clinical findings that are inconsistent with the ALJ's characterization of the medical records as showing she was "consistently cooperative and appropriate notwithstanding anxiety." (Tr. 29.)

To the extent Ms. Cummings is suggesting that the ALJ's decision to limit the *amount* but not the *nature* of her interactions was inconsistent with Dr. McIntire's opinion, this argument must also fail.[6]  In discussing Plaintiff's ability to interact with others, Dr. McIntire opined:

> Ms. Cummings' ability to get along with coworkers is limited by her anxiety and withdrawal as this interferes with her ability to establish and maintain an effective working relationship with others.  She was pleasant and cooperative with the examiner, but also appeared to be self-conscious.

(Tr. 946.)  Regardless of whether this vague opinion—that Plaintiff is "limited" in her ability to get along with coworkers—might support a restriction to "superficial" interactions, there is nothing in the opinion's language to suggest that the ALJ erred or lacked substantial evidence when she found instead that Plaintiff's social limitations were more appropriately addressed through a restriction to "occasional" interactions.  Plaintiff's third argument lacks merit.

As to Plaintiff's final argument—that the ALJ's rejection of the limitation to "superficial" interactions was not supported by substantial evidence—the undersigned finds she has not met her burden to show that the ALJ's analysis lacked the support of substantial evidence.  In support of this argument, Ms. Cummings asserts that "[t]here is clearly evidence supporting a social interaction limitation" but "it is entirely unclear why the ALJ chose to limit Ms. Cummings to occasional interaction with others when the Agency's own expert limited [her] to superficial interaction."  (ECF Doc. 7, pp. 10-11.)  As discussed above, the undersigned finds that the ALJ clearly stated why she adopted an RFC limiting Plaintiff to occasional interactions, and that she appropriately and accurately identified evidence in the record to support her findings.

---

[6] Ms. Cummings does not raise a specific challenge to the ALJ's evaluation of Dr. McIntire's opinion.  Thus, any such challenge is waived.  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted) (alterations in original).

As to Plaintiff's further assertions that the ALJ's adoption of "a quantitative social interaction limitation" is "especially troubling" because "the record only contains a qualitative social interaction limitation, and no specific quantitative social interaction limitation" (*id.* at p. 11), this argument appears to suggest that the ALJ should have adopted the RFC limitations from state agency psychological consultants verbatim and/or should only adopt RFC limitations that align with specific language set forth in a medical opinion.  Neither argument is consistent with Sixth Circuit precedent.  *See Reeves*, 618 F. App'x at 275 (finding "there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor indeed, is the ALJ required to adopt the state agency psychologist's limitations wholesale"); *Mokbel-Aljahmi*, 732 F. App'x at 401 (noting the Sixth Circuit has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ"); *Poe*, 342 F. App'x at 157 (finding "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding").

Here, a review of the record reveals that the ALJ's stated reasons for limiting Ms. Cummings to "occasional" but not "superficial" interactions was supported by substantial evidence.  First, the ALJ found the evidence supported moderate limitations in the area of interacting with others, explaining:

> The claimant was polite and could easily answer questions during the teleclaims process (Exhibit 2E). During the consultative psychological exam, the claimant appeared calm with no signs of anxiety or panic. She appeared depressed with congruent affect and self-conscious but also pleasant and cooperative. Her mental content was normal. She showed no delusional thoughts or appeared confused or disoriented. She endorsed social withdrawal and anxiety but also attended church and got along with her neighbors (Exhibit 9F). The consultative medical examiner observed anxious mood, but clear thought process, good eye contact, and normal speech (Exhibit 10F). She likewise told other providers that she attended church regularly and was cooperative during evaluations (Exhibit 4F).

23

(Tr. 23-24.)  The ALJ also discussed and considered Ms. Cummings's subjective allegations, including her testimony that she was "nervous around people due to anxiety." (Tr. 25.)  The ALJ considered the treatment records and Dr. McIntire's consultative examination and opinion (Tr. 27-28), and explained: "From a mental standpoint, reduced demands for complex tasks, social interactions, novelty, and productivity fully account for the claimant's anxiety and depression, which appears well controlled with conservative medication. She has not sought other treatment modalities for these symptoms, which cuts against claims of debilitating psychiatric symptoms" (Tr. 29.)  The ALJ also evaluated the state agency psychological consultants' opinions, as discussed above, and concluded that the evidence "support[ed] reduced contact with others," but did "not support specific limitation in the nature of the limitations."  (*Id.*)

Based on her review and weighing of the relevant evidence, the ALJ accounted for Ms. Cummings's moderate limitations in interacting with others by limiting her to "occasional interaction with the public, coworkers, and supervisors."  (Tr. 25.)  While Ms. Cummings contends that a different limitation should have been included, the ALJ did not ignore evidence, and she did not fail to explain her reasoning.  As was her responsibility, the ALJ assessed Ms. Cummings's RFC "based on all the relevant evidence in [the] case record."  20 C.F.R. § 416.945(a)(1).  Ms. Cummings has not identified any evidence that would deprive the ALJ's RFC findings of the support of substantial evidence.  Instead, the undersigned finds the ALJ adopted an RFC that fell within the "'zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545).  Regardless of whether substantial evidence might support the adoption of different RFC limitations, this Court cannot overturn the Commissioner's decision "so long as substantial

evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  The undersigned therefore finds that Plaintiff's final argument is without merit.

For the reasons set forth above, the undersigned concludes that the ALJ adequately evaluated and explained her analysis of the state agency psychological consultants' medical opinions and adopted mental RFC limitations that were sufficiently explained and supported by substantial evidence.  Certainly, Plaintiff has not met her burden to demonstrate otherwise.

### VII.    Recommendation

Based on the foregoing, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.


July 16, 2025


/s/*Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge



## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).